MURDOCK, Justice.
Jeff Cottles appeals from a summary judgment entered in favor of Norfolk Southern Railway Company (“Norfolk Southern”) by the Morgan Circuit Court in Cottles’s action under the Federal Employers’ Liability Act (“FELA”), 45 U.S.C. § 51 et seq., for injuries he sustained on April 9, 2012, while working as a track switchman for Norfolk Southern.[1] We reverse and remand.
I. Facts
Before the incident that precipitated this lawsuit, Cottles had worked as a track switchman for Norfolk Southern for seven years. His duties included “lining” track switches for incoming and outgoing rail-cars at industry tracks belonging to Norfolk Southern customers. For about two years before the incident, Cottles had been working a “relief job” that required him to carry out switching duties for Norfolk Southern railcars inside a chemical plant owned by Daikin Industries, Ltd. (“Dai-kin”), two days a week. The crew with whom Cottles worked consisted of locomotive engineer Jason Hall, engineer trainee Jared Cobb, and foreman/conductor Jeff Fretwell. Cottles’s crew switched cars in the Daikin plant two nights a week, and *575 another Norfolk Southern crew performed switching operations the remaining five nights each week. Cottles’s role required him to throw the switches located inside the Daikin plant several..times during a shift.
The Daikin plant contains four railroad tracks; the first three are used for “spotting” railcars, while the fourth- one (“track 4”) is used primarily for storage. The track 4 switch is the first one the ’train crews would come to after coming through the gate inside the fence that surrounds the Daikin plant. Cottles testified that most of the time he and his crew worked on the first three tracks and that, as a result, he did not have to throw the track 4 switch very often, The track 4 switch is located at the beginning of an incline, which requires train crews to apply sand to the tracks to generate friction so that incoming trains can move past it. A bar running across track 4 perpendicular to the track 4 switch serves to keep the switch points down; this is an old design that is no longer used by Norfolk Southern on its main line. Six spikes secure the track 4 switch to its crossties: three spikes on each side of the switch. The' use of spikes to secure switches to-‘crossties is also an old design that Norfolk Southern no longer uses on its main line.
The process of “throwing” a switch involves palling the handle up, moving it in an arc from right to left, stopping in the upright position, and then continuing to move the handle down and to the left. Cottles testified that the track 4 switch was harder to throw than the other switches in the Daikin plant; the other switches “you could pick them up and they get about halfway and they’d pretty much fall over.by.theirself [sic].” In contrast, “[t]he four switch, you’d pick it up and just—you know, it was always hard to do. And you’d get it over three quarters of the way and you’d really have to put your, you know, weight down on [it].” He-admitted that there were other switches on Norfolk Southern’s main line that were also hard to throw.
Cottles testified that he had reported the “hard-to-throw” condition of the track 4 switch to his supervisors on several occasions. Cottles’s coworker Darryl South[2] testified in an affidavit that the switch on track 4 had been “unusually and consistently very difficult to throw,” and coworker Jeff Fretwell testified in an affidavit that the switch on track 4 had “always been very hard to throw.” Both coworkers also testified that they had informed Norfolk Southern of the condition of the track 4 switch on repeated occasions. In fact, South testified that he reported the fact that the track 4 switch was in “bad throwing condition” to assistant trainmas-ter Ray Cooper two days before Cottles’s injury.
• In the early morning of April 9, 2012, Cottles started a shift at, the Daikin plant. In the course of about an hour of work switching railcars, Cottles threw the track 4 switch approximately three to six times. Each of those times, Cottles noticed that the switch was very hard to throw in comparison to the other switches on the tracks in the plant. Cottles. testified that, each time before he threw the track 4 switch, he inspected the stand and the switch points[3] and that everything looked normal.
At around 2:00 a.m., Cottles attempted to throw the track 4 switch again. This time when he pushed the handle down the *576 switch suddenly froze about one foot from the ground, and, according to Cottles, he felt pain in his back and neck. Cottles says he then paused for a few moments to collect himself. He then proceeded to push the switch into place with the aid of his foot. Cottles checked to see if the switch points had closed, i.e., that they had properly aligned against the rails, and he observed that they had not done so. He also observed that the spikes securing the switch stand to the right crosstie had become almost completely dislodged.
Cottles immediately reported the malfunction to his supervisor, assistant train-master Cooper. Upon inspection, Cooper determined that the switch was “un-lina-ble” because of the raised spikes. Later that morning Norfolk Southern assistant division engineer Nathan Wolfe and Norfolk Southern assistant track supervisor Steve McGill also inspected the track 4 switch and deemed the switch points to be “dry” and the switch stand to be loose.
Within a week of the incident, Cottles’s pain from his injuries had become so severe that he was unable to continue his job. He was diagnosed with bulging disks in his neck and a pinched nerve in his back. An orthopaedic surgeon also identified two tears in the rotator cuff of Cot-tles’s right shoulder, and Cottles had corrective surgery on the shoulder. Cottles has not been able to return to work since the surgery.
It is undisputed that Daikin, not Norfolk Southern, owns the tracks and switches inside its plant. When Norfolk Southern’s Cooper received a complaint about a switch inside the Daikin plant, he either contacted Daikin directly or he passed the complaint on to Norfolk Southern’s operational services and support department. Regardless of who was notified, Daikin itself was required to address the issue and then to notify Norfolk Southern that the problem had been fixed. After Norfolk Southern received word from Daikin that maintenance had been performed, a Norfolk Southern track inspector would inspect the switch to confirm that the repairs had been completed. If they had, the track supervisor would send Cooper an e-mail stating that the switch or portion of track in question was “ready for service” or “good to go.”
Daikin handled its maintenance duties through two departments. Its maintenance department was responsible for routine monthly maintenance that, with regard to switches, primarily involved applying grease to the switches. The warehouse department fielded specific complaints about track conditions. When it was reported that a switch was hard to throw, the warehouse department would contact the maintenance department to have grease applied to the switch. After this task was completed, a warehouse supervisor would perform a follow-up inspection.
Norfolk Southern assistant track supervisor McGill has the primary duty of track inspections over the territory that contains tracks on which Norfolk Southern employees work in Decatur, including the tracks inside the Daikin plaint. McGill is trained in Federal Railroad Administration (“FRA”) Track Safety Standards that are codified as federal regulations (“FRA regulations”).[4] He inspects Norfolk Southern’s main line in the territory twice each week; he inspects the track and switches inside the Daikin plant once each month. During those monthly inspections, McGill does not usually throw switches. It is undisputed that McGill inspected the tracks in the Daikin plant, including all the *577 switches, on March 29, 2012—11 days before the April 9, 2012, incident—and that he did not find anything wrong with the track 4 switch at that time. It is also undisputed that McGill did not throw the track 4 switch during that inspection.
On June 14, 2012, Cottles filed in the Colbert Circuit Court a FELA action against Norfolk Southern alleging that Norfolk Southern “failed to provide [Cot-tles] with a reasonably safe place to work” and that, as a result, Cottles sustained permanent damage to his neck and his back. In addition to his claims of negligence, Cottles asserted that Norfolk Southern was strictly liable under the Federal Safety Appliance Act (“FSAA”)[5] and/or “applicable FRA standards.” On November 1, 2012, Norfolk Southern filed a motion to transfer the action to Morgan County; Cottles consented to the motion, and the action was transferred the following day.
During discovery, Cottles submitted interrogatories to Norfolk Southern. Among other things, Cottles asked whether Norfolk Southern had “received any written or oral complaints from [Norfolk Southern’s] conductors or trainmen that switch No. 4 in the Daikin Plant was not functioning correctly?” Norfolk Southern answered that “to its knowledge” it had not received any such complaints “during 2010, 2011, or 2012” other than following the incident that precipitated the lawsuit. Subsequently, discovery consisted of the depositions of Cottles, Cottles’s railroad expert, Joe Lydick, and Cottles’s medical expert, Dr. Lauren Savage.
On June 11,2014, Norfolk Southern filed a motion for a summary judgment. Norfolk Southern contended that Cottles’s own testimony that he had thrown the track 4 switch three to six times earlier during his shift on April 9, 2012, “without incident” and the fact that his own visual inspection before each throw had not revealed any defects in the switch demonstrated that Norfolk Southern had no notice that the track 4 switch was defective. Concerning Cottles’s strict-liability claims, Norfolk Southern cited testimony from Lydick indicating that he could not say that the FSAA applied to the switch involved in this case and that there was no violation of an FRA regulation by Norfolk Southern because it was not the owner of the track.
On August 22, 2014, Cottles filed his response to the motion for a summary judgment. Regarding his negligence claims, Cottles relied upon testimony from himself, from Fretwell, and from South recounting that the track 4 switch was notoriously hard to throw and that this condition had been reported to Norfolk Southern personnel on several occasions. He also cited testimony from Lydick indicating that an inspector trained in FRA-regulation standards would have noticed the defective condition of the track 4 switch by throwing the switch. In addition to Lydick’s expert report and his deposition, Cottles filed an additional affidavit from Lydick to “clarify” his testimony on a particular point. In the new affidavit, Lydick asserted that violations of FRA regulations by Daikin could be imputed to Norfolk Southern under FELA even if Norfolk Southern itself was without fault.
On August 27, 2014, the trial court set a hearing on Norfolk Southern’s summary-judgment motion for October 9, 2014. On October 7, 2014, Norfolk Southern filed its reply to Cottles’s opposition to the summary-judgment motion. It also filed a motion to strike Lydick’s affidavit as an improper legal opinion and to strike Lydick’s expert report as inadmissible hearsay.
*578 According to Norfolk Southern, in September 2014 it learned that a train crew had made a complaint on February 20, 2012, that the track 4 switch was “hard to throw.” On October 3, 2014, Norfolk Southern- amended its interrogatory answer to Cottles’s question concerning employee -complaints about the track 4 switch to relate the information it had learned about the February 20, 2012, complaint. Norfolk Southern subsequently submitted paperwork related to that complaint, which included an e-mail from Cooper reporting the complaint and a fax . from Norfolk Southern personnel to Daikin warehouse, supervisor Magellan Senior asking for the s\vitch .to be serviced and to let Norfolk Southern know when that service had been completed. Norfolk Southern also submitted several more . photographs of the switch taken on the day of the incident.
On October 8, 2014, Cottles scheduled depositions of Cooper, McGill, Senior, and Daikin maintenance supervisor Tim Crow-den. Norfolk Southern also scheduled a deposition for Darryl South. Those depositions occurred on November 18, 2014. Cottles obtained additional information from • those depositions, which included: testimony that Norfolk Southern had received multiple complaints about the fact that the track 4 switch was hard to throw; that Shelton Railroad, which conducts quarterly inspections and track repairs for Daikin, had recommended to Daikin in January 2012 that the track 4 switch be replaced; and that Norfolk Southern did not have documented evidence that it had confirmed that Daikin had performed maintenance on the track 4 switch following South’s complaint two days before the incident. Counsel for the parties .received transcripts of the depositions on November 21, 2014.
At the hearing on Norfolk Southern’s motion for a summary judgment, Cottles’s counsel conceded- that Cottles’s strict-liability claim under the FSAA was due to be dismissed. Cottles’s counsel also informed the trial court about his request for the additional depositions; he did not seek a continuance of the hearing in light of this fact.
On November 24, 2014, the trial court entered a summary judgment in favor of Norfolk Southern. At the outset of the order the trial court denied Norfolk Southern’s motion to strike with regard to Ly-dick’s expert report, but it granted the motion with regard to Lydick’s post-deposition affidavit. Concerning the central issues, the trial court stated:
“It is undisputed that the switch in question was located -along railroad tracks owned by Daikin Industries, Ltd. (‘Daikin’), inside its chemical plant property in Decatur, Alabama; that the switch had a long history of being ‘hard to throw,’ that [Norfolk Southern] had notice that the subject switch was ‘hard to throw"; that [Norfolk Southern] inspectors had inspected the subject switch about two weeks before April 9, 2012, and -found no. defects; that the plaintiff had thrown the subject switch three to six times earlier without incident or injury during the shift when he was allegedly injured; and that at the time of his alleged injury, the plaintiff was attempting to throw the switch when three spikes that secured the switch stand to a railroad tie pulled loose, resulting in the switch stand moving or tilting and impeding operation of the.switch. There is no evidence that anyone, prior to [Cottles’s] alleged injury, had observed and reported to [Norfolk Southern] or Daikin that the railroad tie had deteriorated, that the spikes were pulling loose from the railroad tie or that the switch stand was not *579 stable or moved excessively during the switching operation.
“The Court finds from the record before it that [Cottles] has not presented substantial evidence that creates a genuine issue of material fact as to whether [Norfolk Southern] negligently failed to provide him with a reasonably safe workplace. The Court also finds no support under the particular circumstances of this case for [Cottles’s] contention that Daikin’s negligence, if it was negligent in maintaining the subject switch, is imputed to [Norfolk Southern] and is sufficient to hold [Norfolk Southern] liable under FELA. [Norfolk Southern] is entitled to the entry of a judgment in its favor as a matter of law.”
On December 12, 2014, Cottles filed a “Motion to Alter, Amend, or Vacate the Court’s ‘Order on Defendant’s Motion for Summary Judgment’ and To Offer, for the Court’s Consideration, Additional Evidence to Support its Rule 59(e), [Ala. R. Civ. P.,] Motion.” Along with his motion, Cottles filed “new and additional evidence” garnered from the depositions taken on November 18, 2014. In his motion, Cottles argued that the “new evidence” further supported his claim that Norfolk Southern negligently failed to provide Cottles with a safe place to work; that the court erroneously struck Lydiek’s affidavit; and that Daikin’s negligence was properly imputed to Norfolk Southern under the circumstances.[6]
On February 5, 2015, the trial court heard arguments concerning Cottles’s postjudgment motion.. On February 11, 2015, the trial court entered an order denying the motion. Concerning the submission of additional evidence, the trial court stated:
“To the extent that the Motion is intended to supplement the evidentiary record that was before the Court when it ruled on [Norfolk Southern’s] Motion for Summary Judgment, [Cottles’s] offer of ‘additional evidence’ is denied and the ‘additional evidence’ is not considered by the Court. The Court is not satisfied that the ‘additional evidence’ is newly discovered evidence that was unknown to [Cottles] or that could not have been obtained and timely presented through the exercise of reasonable diligence.”
On March 16, 2015, Cottles filed the instant appeal.
II. Standard of Review
“Although the FELA authorizes the filing of a federal action for an employer’s alleged failure to provide a safe workplace, and'although the substantive law governing such cases is federal, St. Louis Southwestern Ry. v. Dickerson, 470 U.S. 409, 411, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985), ‘[a]s a general matter, FELA cases adjudicated in a state court are subject to. the state’s procedural rules.’ Alabama Great So. R.R. v. Jackson, 587 So.2d 959, 962 (Ala.1991). Thus our standard in Alabama for reviewing a summary judgment applies.
“In performing such a review, we use the same standard the trial court used in determining whether to deny or to grant the summary-judgment motion. We must determine whether the evidence presents a genuine issue of material fact and whether [Norfolk Southern], the ..movanf, was entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P. If [Norfolk Southern] makes a prima facie showing that no genuine issue of material fact exists, the burden then *580 shifts to [Cottles] to present substantial evidence creating such a genuine issue of material fact. Bass v. SouthTrust Bank, 538 So.2d 794, 798 (Ala.1989). Evidence is ‘substantial’ if it is of ‘such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). This Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d [412] at 413 [ (Ala.1990)].”
Glass v. Birmingham Southern R.R., 905 So.2d 789, 792-93 (Ala.2004).
III. Analysis
Before we address the central issue in this appeal, we note one preliminary matter that Cottles contends constituted an error by the trial court, although Cot-tles admits that the issue is “not disposi-tive to this case.” Specifically, Cottles argues that the trial court erred in striking from the record the entirety of the affidavit submitted by his expert, Joe Lydick.
In the first substantive paragraph of his affidavit, Lydick stated:
“The no. 4 track and switch at the Dai-kin plant facility in Decatur, Alabama, because Norfolk Southern operates inside the plant facility on that track, must comply with the Federal Railroad Administration (FRA) Track Safety Standards for Class 1 track.... What this means in practical terms is that Daikin must maintain the no. 4 track and switches exactly as Norfolk Southern would have to maintain a track or switch.”
In the second substantive paragraph of his affidavit, Lydick expressed that he wished to clarify certain testimony from his deposition. Specifically, in his deposition Lydick had stated that under FRA regulations Daikin was responsible for maintaining the track 4 switch. In his affidavit, Lydick stated:
“My statement that the Code of Federal Regulations 213.5 only applies to the owner of track no. 4 ignores the fact that Daikin has to comply with the FRA regulations. Since I am not an attorney, I have no opinion as to whether [Norfolk Southern] has a non-delegable duty to Mr. Cottles to maintain a safe workplace. But if the law is that [Norfolk Southern] does have a non-delegable duty to provide the same type of safe workplace that it does on its own track and switches, then [Norfolk Southern] through Daikin has, in fact, violated the Code of Federal Regulations as they apply to compliance, switches, and cross-ties.”
As we noted in the rendition of the facts, Norfolk Southern moved to strike Lydick’s affidavit on the ground that he offered a legal conclusion that Daikin’s negligence could be imputed to Norfolk Southern, and the trial court granted its motion to strike.
On appeal, Cottles states that he does not object to the trial court’s refusal to accept Lydick’s affidavit “[t]o the extent Lydick made a legal conclusion that Dai-kin’s negligence is imputed to Norfolk Southern by way of agency.” He argues, however, that the trial court erred in striking Lydick’s affidavit in its entirety.
As we observed in the rendition of the facts, Cottles has conceded on appeal that his imputed-negligence theory offered in the trial court was incorrect. But on appeal, the issue is not one of imputation to Norfolk Southern of Daikin’s negligence. Instead, if Norfolk Southern itself had a nondelegable duty to maintain the track *581 at issue (including switches) in a condition that provided a safe working environment for Cottles, and if the failure of the track to be maintained in accordance with FRA regulations was relevant to whether the track constituted an unsafe working environment, then whether the track was in fact maintained in accordance with FRA regulations (whether by Daikin or anyone else) was relevant to the issue of Norfolk Southern’s liability. If, as a factual matter, Daikin did maintain the track in keeping with FRA requirements, such maintenance would redound to Norfolk Southern’s benefit. Conversely, if Daikin did not so maintain the track, and Norfolk Southern also did not do so, then the result is that the track was, in fact, not maintained as required by the FRA. The decision of the trial court therefore to strike Lydick’s affidavit in its entirety, particularly as it tends to establish that the track was not maintained in accordance with FRA regulations, was in error.
We turn now to the central issue in this appeal: Whether Cottles presented substantial evidence that Norfolk Southern negligently failed to provide him with a reasonably safe workplace.
FELA provides, in pertinent part:
“Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its ... machinery ... or other equipment.”
45 U.S.C. § 51.
Concerning FELA, this Court has explained:
“The FELA was enacted in 1908 in order to provide railroad employees a remedy for injuries and death resulting from accidents on interstate railroads. Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 542, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). Congress enacted the FELA because of its frustration with rail companies’ evading liability to their employees for such injuries and death; consequently, the FELA strips such an employer of many of its common-law defenses. Rogers v. Missouri Pac. R.R., 352 U.S. 500, 507-08, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). While the FELA is to be construed liberally, it is not a workers’ compensation statute, Gottshall, 512 U.S. at 543, 114 S.Ct. 2396, 129 L.Ed.2d 427, nor does the FELA render an employer an insurer of the safety of its employees. Atlantic Coast Line R.R. v. Dixon, 189 F.2d 525, 526 (5th Cir.1951).
“Despite the liberal manner in which the FELA is to be construed, ‘[t]he basis of the employer’s liability is its negligence, not the mere fact that the injury occurred.’ Dixon, 189 F.2d at 527; see also Louisville & Nashville R.R. v. Green, 255 Ala. 642, 644, 53 So.2d 358, 359 (1951). ‘Employer negligence remains a prerequisite to liability.’ Soto v. Southern Pac. Transp. Co., 644 F.2d 1147, 1148 (5th Cir.1981).”
Glass v. Birmingham Southern R.R., 905 So.2d at 793.
“Pursuant to the FELA, a railroad owes its employees a duty to provide a safe workplace. Glass v. Birmingham Southern R.R., 905 So.2d 789 (Ala.2004). This duty is more expansive than the general duty to use reasonable care. Ex parte Williams, 554 So.2d 440 (Ala.1989) (Jones, J., dissenting). In order to re *582 cover under a FELA claim alleging negligence, the plaintiff must prove the existence of a duty, a breach of that duty, causation, and damage. Glass, supra; Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 542, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). A relaxed standard of causation has been applied under the FELA. ‘ “Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.”' Gottshall, 512 U.S. at 543, 114 S.Ct. 2396 (quoting Rogers v. Missouri Pacific R.R., 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)).”
CSX Transp., Inc. v. Miller, 46 So.3d 434, 460-61 (Ala.2010) (emphasis added).
The core of Cottles’s argument is that, even without the “new evidence” he submitted along with his Rule 59(e), Ala. R. Civ. P., motion, he presented substantial evidence “that Norfolk Southern knew or should have known of the Track 4 switch’s defective condition yet did nothing to correct the condition.” Cottles points to testimony from himself and his coworkers Darryl South and Jeff Fretwell in which they stated that the track 4 switch had always been hard to throw and that this condition had been reported to Norfolk Southern supervisors on several occasions but that its condition never improved. He argues that this testimony constitutes notice of a defective condition and a failure by Norfolk Southern to provide a safe work environment by its failure to ensure that the defect in the tract 4 switch was repaired.
Norfolk Southern counters that, even though the track 4 switch was hard to throw and it had been informed of this fact,
“it had no notice of the condition which caused the incident and [Cottles’s] claimed injury—i.e., the spikes on the switch stand working themselves out of the tie, which caused the switch to suddenly ‘bind’ and that [Norfolk Southern] was not negligent in its inspections of the switch, which, again, was owned and maintained by Daikin.”
In fact, throughout its brief Norfolk Southern focuses on the two points touched on in the above-quoted passage from its brief: (1) there is, it says, a distinct difference between the track 4 switch being hard to throw and the switch coming loose from its stand as a result of three spikes rising up from the right crosstie; and (2) Norfolk Southern does not own or maintain the track 4 switch. Neither of those points, however, actually absolves Norfolk Southern of potential liability in this case.
Taking the two points in reverse order, the fact that Daikin owns the track and switches inside its plant does not relieve Norfolk Southern of its duty under FELA to provide a safe work environment to its employees such as Cottles. As the United States Supreme Court has observed: “[A] railroad has the nondelegable duty to provide its employees with a safe place to work even when they are required to go onto the premises of a third party over which the railroad has no control.” Shenker v. Baltimore & Ohio R.R., 374 U.S. 1, 7, 83 S.Ct. 1667, 10 L.Ed.2d 709 (1963). This is the very reason Norfolk Southern performs its own regular inspections of the track and switches inside the Daikin plant. Even though Daikin performs the regular maintenance on the track and switches inside its plant, Norfolk Southern is still responsible for notifying Daikin of problems of which it is aware and for ensuring that such problems are fixed in a manner that does not compromise the safety of Norfolk Southern’s employees. Again, this was the reason for the procedure in which assistant trainmas- *583 ter Cooper would notify Daikin of any problems reported to him; Daikin would then report back to Norfolk Southern after it had remedied the problem; and Norfolk Southern inspectors would perform their own inspection to ensure that the maintenance had been performed. The possibility that Daikin may have been negligent in its maintenance of the track 4 switch does not relieve Norfolk Southern of potential liability under FELA because “ ‘the test of a jury case [under FELA] is simply whether ... employer negligence played any part, even the slightest, in producing the injury.’” CSX Transp., Inc. v. McBride, 564 U.S. 685, 692, 131 S.Ct. 2630, 180 L.Ed.2d 637 (2011) (quoting Rogers v. Missouri Pac. R.R., 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)) (emphasis added).
Although Norfolk Southern repeatedly notes that it does not own the track or the switches inside the Daikin plant, the primary point it argued in its summary-judgment motion and that it emphasizes in its brief to this Court is that .there is no direct connection between the undisputed fact that the track 4 switch was hard to throw and the malfunction in the switch that eventually occurred, i.e., the loose, spikes on the right crosstie. This argument goes to Norfolk Southern’s possible negligence—whether Norfolk Southern’s inspector should have noticed a defect in the track 4 switch, given that its employees repeatedly had reported the switch as being hard to throw. Norfolk Southern notes that its inspector,' assistant track supervisor McGill, did not notice a visible problem with the track 4 switch approximately two weeks before the incident and that Cottles’s expert, Joe Lydick, testified that a simple visual inspection would not have detected such a problem.' Norfolk Southern also emphasizes that Cottles himself did not see any problem with the switch each time he prepared to throw it before his injury occurred and that he threw it three to six times “without incident” in the hours before he sustained his injury., Norfolk Southern maintains that these facts establish that there is no evidence indicating that it committed any negligence that contributed to Cottles’s injury. The trial court essentially adopted this line of reasoning in its summary judgment.
The problem with Norfolk Southern’s argument is that Lydick’s testimony provides the link that Norfolk Southern contends does not exist. Lydick served as a Federal Railroad Safety Act (“the FRSA”) track-safety inspector for almost 25 years and also served as a “Safety Assurance and Compliance Program Manager/Railroad Safety Oversight Manager” assigned to CSX Transportation. When Lydick was asked for his opinion of what happened to the track 4 switch on the occasion that Cottles was injured, Lydick explained: “Based on the knowledge I have, that the head block ties were defective, that there was, you know, excessive lost motion in the stand and that it was causing the switch to bind even more when [Cottles] was trying to operate' it because of that.” Lydick further explained:
“I think that something—because of the condition of the switch plates and the condition of the lubrication on the switch that something happened that time that when [Cottles] went to operate it, the spikes lifted on one side of the stand and it caused the switch to be in a bind and that’s what caused it to have the issue. And it was in such a bind that when he finally did close it, the points didn’t match up, you know, to the stock rails. There was a gap. I never, did know exactly how big a gap, but there’s a gap.
“So, you know, the excessive lost motion, because of the defective switch ties.... ”
*584 When he was asked to describe how he thought Cottles was injured, Lydick stated:
“I wasn’t there, but I—you know, [Cot-tles] was using the force that he—the way I understood it, reading his deposition—and I’m not trying to speak for Mr. Cottles—but it’s my understanding that the switch had always been hard to throw, it was known that it was a hard to throw switch, and that when he went to operate this switch, he knew he was going to have more resistence than he would have for the other switches there that he said were easy. And so he was using the—you know, this is an assumption on my part, but he was using the same amount of force he would normally use to throw it and when he got to the point about a foot before it went down, it stopped on him.”
Thus, all of Lydick’s answers focused on an excessive loss of motion in the switch, i.e., the moment the switch froze in place.
Norfolk Southern’s counsel asked: “[Cottles] didn’t describe anything that you would consider excessive loss of motion on the previous occasions [when he threw the switch] ... ?” In other words, Norfolk Southern’s counsel was asking whether Cottles had noticed anything prior to the occasion on which he threw the switch and was injured that indicated the condition that caused the switch to malfunction. Lydick answered: “[Cottles] said that it was hard to throw. That could equate to excessive loss of motion as one of the factors.” Later in Lydick’s deposition, Norfolk Southern’s counsel asked the question again:
“Q. Okay. But putting aside the subjectivity of that, the switch being, quote, ‘hard to throw,’ Mr. Cottles reported earlier that’s not what he says caused him to be hurt on this occasion, is it?
“A. I don’t know if I understand the question.
“Q. I mean, the condition that Mr. Cot-tles was reporting—or he said he reported—that’s not what caused him to be hurt in this case, is it, according to his testimony?
“A. Well, yes it was. I mean, the switch is—wasn’t properly maintained, it was known as hard to throw because it was out of adjustment and the reason he got hurt was because the switch was in the condition I just described. I mean—
“Q. Well, I mean, he—he didn’t get hurt on those prior occasions when he says he reported it. He didn’t get hurt on those three to six prior occasions this very shift where he says it was hard to throw as usual. Something different happened on this last occasion with these spikes working themselves out. That’s what results in the binding that he says he got hurt on, true?
“A. Well, and then it finally reached a point of total ... malfunctioning and failure and—and, you know, this is what occurred. It stopped abruptly a foot prior and then when he went ahead to apply it down and it popped the—at some point the spikes came out.”
(Emphasis added.) In other words, Ly-dick testified that the fact that the switch was hard to throw was a symptom of its defective condition, a condition that reached a state of complete malfunction on the occasion Cottles was injured. He indicated that excess friction in the switch required extra force to throw the switch and the point of least resistence that received the most force was the spikes securing the right crosstie, which eventually became loose to the point that the switch stopped working altogether.
The trial court appears to have ignored this testimony because it conclud *585 ed that Norfolk Southern had no notice of the condition the trial court, assumed caused Cottles’s injury: the spikes coming loose from the right crosstie. The real issue, however, is whether Norfolk Southern should have known that the “hard-to-throw” condition of the switch indicated that there could be something wrong with it. As the United States Supreme Court has explained:
“ ‘[Reasonable foreseeability of harm,’ we clarified in Gallick [v. Baltimore & Ohio R.R., 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963) ], is indeed ‘an essential ingredient of [FELA] negligence.’ 372 U.S. at 117 (emphasis added). The jury, therefore, must be asked, initially: Did the carrier ‘fai[l] to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances[?]’ Id. at 118.”
CSX Transp., Inc. v. McBride, 564 U.S. at 703. Under this standard, the question is not whether Norfolk Southern could have anticipated that the spikes would come loose, but whether Norfolk Southern could have anticipated that the “hard-to-throw” condition of the switch at least warranted a further investigation.
This brings to the fore the nature of the inspections performed by Norfolk Southern. Norfolk Southern emphasizes the fact that Cottles did not notice any defect in the switch before he threw it and the fact that Lydick testified that a visual inspection would not have revealed that the spikes were coming loose. Those facts, however, relate only part of Lydick’s testimony. In two portions of his deposition, Lydick explained why Cottles would not necessarily have noticed the extent of the defectiveness of the switch even though a person trained in track inspection would have, and, even more importantly, he unequivocally testified that if. a qualified inspector had thrown the track 4 switch, the defect would have been noticed. In the first portion of the testimony, Lydick was asked about what he observed of the switch from photographs of it.
“Q. Federal regulations don’t require the switch actually be thrown every time [it’s] inspected, do they?
“A. Only on Class 3 through 5, and that’s quarterly.
“Q. So it would not apply—it would not be required by regs?
“A. No, sir.
“Q. Well, again, I guess my question is: Is there anything that you can point to that would say a reasonable inspector from Norfolk Southern should have been able to ascertain from inspection prior to this occasion that would have put it on notice of defect or a problem with the switch?
“A. Let me go to—based on what I was provided, the last inspection of this switch was [March 12, 2012,] and the incident happened on April 9—I take that back. March 29, it was inspected.
“Q. About two weeks before the incident?
“A. Correct.
“Q. Is that a Norfolk Southern or is that a Daikin inspection?
“A. That’s a Norfolk Southern.
“Q. Okay.
“A. And based on the condition of the switch and based on constructive knowledge of the fact that this condition doesn’t get created overnight or immediately, if he- would have been operating that switch, he would see that those-those spikes were not securing, that stand.
“Q. You’re talking about the inspector on March 29?
“A. Yes.
*586 “Q. Even though Jeff Cottles, the Plaintiff,' had no such trouble earlier on the shift in question on March 9, excuse me, April 9?
“A. He threw it previously, but I mean, somebody that’s knowledgeable and qualified under 213.7 of the [FRA] regulations, if they operate a stand, that’s what you’re looking for. You’re looking for los[t] motion. You’re looking to see if the stand is secured.' And based on the fact of what happened to this switch stand two weeks later, I can tell you those spikes were not securing those ties at that time, either. And a—and a qualified person should be able to recognize that.
[[Image here]]
“Q. So there’s no basis to say that the spikes would have been visibly coming loose or visibly a problem on March 29, is there? That would be speculation, wouldn’t it?
“A. Well, based on my experience of 43 years of doing this and—and working on many of these switches, if you’ve got a condition to where you can—the spikes will come out of a switch stand like that, then you had a condition prevalent prior to that. And, like I say, this condition doesn’t get this way overnight. I mean, it takes a period of time for the deterioration to happen—you know; and this thing was split and it was—it wasn’t a well-maintained switch to start with and when this finally—when he finally had' a situation where something bound on the switch, then the point of least resistence, evidently, was the switch stand that came up and the spikes came out.
“Q. You’re not saying that the condition of the head block tie itself was such that it should have been taken out of service, are you?
“A, Yes. I mean, based on what happened here with Mr. Cottles, the condition of those ties [was] defective.
“Q. Well, yeah, that’s after the fact. I’m saying looking at the switch—the tie itself, the head block tie you’re talking about—
“A. Uh-huh.
“Q. —if the spikes were in place and. the switch appears to be operating normally, there’s nothing about that tie itself that would say it neéds to be taken out of service, is there?
“A. Well, the tie was split for one. And that’s one of the noncomplying conditions of a defective tie. But somebody, if they’re actually operating that switch stand, they would see that this thing wasn’t secure. That’s what I’m saying. And, you know, two weeks prior to that, I certainly believe I would have found it.”
(Emphasis added.)
In the second portion of his deposition testimony, Lydick was again asked whether there was a visible-defect in the switch,
“Q. But there’s nothing, visible about the switch, the components of the switch, that would put somebody on notice that something’s got to be changed here or there or taken out of service, is .there?
“I mean, I realize—I hear Mr. Cot-tles’[s] story about reporting the switch being hard to throw, but in terms of visual inspections of the components of the switch, there’s nothing that would say to an experienced inspector that that needs to be taken out of service, is there?
“A. Just to walk up to the switch-and look at it, on the surface I don’t see anything that says you’ve got to take it out- of service. That’s the reason you operate them. I mean, you don’t know *587 how a switch operates unless you operate it yourself and that’s the reason [Norfolk Southern] has that in their standard.
“Q. Okay. And if it was operated by an inspector who didn’t think it was necessarily hard to throw, again there’d be no reason for further action, would there? Just because somebody else says it’s hard to throw doesn’t mean it’s got to be taken out of service.
“A. If somebody under 218.7 [of the FRA regulations] threw it and didn’t recognize—
“Here’s the problem I have. With the conditions that we know the post accident investigation. If—if those spikes came out the way they did, that stand was moving before, in my opinion, two weeks prior to when that inspector threw it.
“Q. Okay. Even though there's no evidence of that on the prior occasions on this shift from Mr. Cottles?
“A. You know, I can’t make that statement because, first of all, Mr. Cottles, you know, is trained to' go out and— when he operates the switch to make sure there’s no obstruction in the points and, you know, look at something that’s—you know, that he—because he’s not trained as far as under 213.7 [of the FRA regulations] to know what he’s looking ■ for. And he goes to do his normal thing of inspecting the points and then operating the switch and then afterwards making sure the points is close. And then he, you know, asked for the movement to come back. In this scenario if this stand is moving or whatever, I don’t know that he—-he has the knowledge to know what’s going on. All he knows is it’s a hard-to-throw switch,”
(Emphasis added.)
In an effort to neutralize the foregoing testimony from Lydick, Norfolk Southern cites the fact—conceded by Lydick—that FRA regulations do not require an inspector to throw- a switch on the type of track at issue in this case.[7] Norfolk Southern notes that the FRSA, which is the basis fori the FRA regulations, provides that “[l]aws, regulations and orders related to railroad safety .... shall be nationally uniform to the extent practicable.” 49 U.S.C. § 20106(a)(1). On this basis, Norfolk Southern argues that “a railroad’s duty to its employees under the FELA is defined by or cannot exceed that imposed by an FRA regulation with respect to the subject matter of the regulation.” In other words, Norfolk Southern argues, because FRA regulations do not stipulate that Norfolk Southern assistant track supervisor McGill had to throw the track 4 switch when he inspected it on March 29, 2012, FELA cannot hold Norfolk Southern to a different standard concerning its duty to provide Cottles with a safe workplace.[8]
Norfolk Southern cites. .several federal cases in support of its position, including Waymire v. Norfolk & Western R.R., 218 F.3d 773 (7th Cir.2000). Notably, however, the United States Supreme Court has not. directly passed on the question whether FELA may establish a different standard of care than an FRA regulation on the same subject. Moreover, the most *588 recent, and better reasoned, court decisions to address the issue have concluded that the standards can, indeed, differ.
In departing from Waymire and its progeny, these more recent decisions have started by explaining the differences in purpose between FELA and the FRSA.
“Enacted in 1908, the FELA provides railroad employees with a federal cause of action for injuries ‘resulting in whole or in part from the negligence’ of the railroad. 45 U.S.C. § 51. ‘Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the human overhead of doing business from employees to their employers.’ Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 542, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994) (internal quotation marks omitted). Through the FELA, Congress sought to ‘d[o] away with several common-law tort defenses that had effectively barred recovery by injured workers.’ Id. Courts are required to ‘liberally construe[ ] FELA to further Congress’ remedial goal.’ Id. at 543, 114 S.Ct. 2396; accord Kernan v. Am. Dredging Co., 355 U.S. 426, 432, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) (‘[I]t is clear that the general congressional intent [behind the FELA] was to provide liberal recovery for injured workers, and it is also clear that Congress intended the creation of no static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts of industry’s duty toward its workers.’ (citation omitted))....
“The FRSA was enacted in 1970 ‘to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents.’ 49 U.S.C. § 20101. The FRSA grants the Secretary of Transportation the authority to ‘prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations in effect on October 16, 1970.’ 49 U.S.C. § 20103(a). The Secretary of Transportation has delegated this authority to the Federal Railroad Administration (‘FRA’). Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm’n, 346 F.3d 851, 858 n. 8 (9th Cir.2003). The FRSA does not create a private right of action; enforcement powers under the statute are vested solely with the Secretary of Transportation and, under certain conditions, the States or the Attorney General. Walsh v. CSX Transp., Inc., No. 1:07—CV-978 (GLS/DRH) ... (N.D.N.Y. Feb. 18, 2009).”
Henderson v. National R.R. Passenger Corp., 87 F.Supp.3d 610, 612 (S.D.N.Y. 2015).
With respect to 49 U.S.C. § 20106(a)(1), these courts have noted that this particular section of the FRSA refers to preemption of state laws, not to preclusion of a federal claim under FELA.
“In a section addressing the preemption of certain state laws, the FRSA provides that ‘[l]aws, regulations, and orders related to railroad safety ... shall be nationally uniform to the extent practicable.’ 49 U.S.C. § 20106(a)(1). To maintain such uniformity, the FRSA contains an express preemption clause, pursuant to which ‘[a] State may adopt or continue in force a law, regulation, or order related to railroad safety ... until the Secretary of Transportation ... prescribes a regulation or issues an order covering the subject matter of the State requirement.’ 49 U.S.C. § 20106(a)(2). The FRSA preempts covered state law tort claims, in addition to covered state statutes and regulations.”
*589 Henderson, 87 F.Supp.3d at 613. See also Infermo v. New Jersey Transit Rail Operations, Inc. (No. 10-2498(SRC), Jan. 24, 2012) (D.N.J.2012) (not selected for publication in F.Supp.) (observing that “the language of FRSA itself gives no indication that the express preemption clause crafted to address potentially varying and disparate state laws concerning standards for the operation and maintenance of the national rail system should, by implication, extend to subsume matters governed by FELA, which is concerned primarily with providing injured railroad employees a deliberately attainable remedy”).
These courts also have observed that Congress easily could have provided that regulations promulgated pursuant to the FRSA preclude recovery under FELA where the two conflict, but it did not do so.
“When Congress enacted FRSA in 1970, FELA had been in existence for more than 60 years. (See FRSA, Pub.L. No. 91-458 (Oct. 16, 1970) 84 Stat. 971; FELA, 60 Cong., ch. 149 (Apr. 22, 1908) 35 Stat. 65.) Given that history, the absence of any provision in FRSA addressing its effect on FELA is significant. If Congress had concluded that FELA suits would interfere with the operation of FRSA, it could have enacted a provision addressing the issue during these statutes’ 45 years of coexistence. (POM Wonderful, [LLC v. Coca-Cola Co.], 134 S.Ct. [2228] at p. 2237 [ (2014) ].) In light of FRSA’s failure to mention its effect on FELA, Congress could not have intended preclusion of FELA claims when that would harm FELA’s purpose of promoting the safety of railroad workers by (1) leaving injured workers with no recourse against their employer when their claim is based on conduct they allege was negligent but which complies with FRSA and its regulations, and (2) insulating broad categories of potentially negligent conduct from any accountability.”
Fair v. BNSF Ry., 238 Cal.App.4th 269, 289, 189 Cal.Rptr.3d 150, 165 (2015).
Most persuasively, these courts apply the United States Supreme Court’s reasoning in POM Wonderful, LLC v. Coca-Cola Co., 573 U.S. -, 134 S.Ct. 2228, 189 L.Ed.2d 141 (2014), to the interplay between the FRSA and FELA. The Fair court summarized the POM Wonderful decision as follows:
“In POM Wonderful, the question was whether a suit under the Lanham Act (15 U.S.C. § 1125) alleging that Coca-Cola, the plaintiffs business competitor, used a deceptive and misleading label on Cocar-Cola’s product, was precluded by the Federal Food, Drug and Cosmetic Act (FDCA) (12 U.S.C. §§ 331, 343), that forbids the misbranding of food, including by false and misleading labeling, and places enforcement of mis-branding of food and drink in the hands of the Food and Drug Administration (FDA). (POM Wonderful, supra, 134 S.Ct. at p. 2233.) The Ninth Circuit Court of Appeals held the FDCA precluded the Lanham Act claim, reasoning that Congress decided to entrust matters of juice beverage labeling to the FDA, which promulgated comprehensive labeling regulations that did not impose the requirements the plaintiff sought to impose on Coca-Cola. (POM Wonderful, supra, 134 S.Ct. at p. 2236.) The Ninth Circuit did not believe it should act where the FDA had not, as to do so would risk undercutting the FDA’s expert judgment and authority. (Ibid.)
“The Supreme Court reversed, finding preclusion did not apply, as: (1) there was no statutory text or established interpretive principle to support preclusion, (2) nothing relating to either statute showed a congressional purpose or *590 design to forbid such suits, and (3) to the contrary, the statutes complemented each other in the federal regulation of misleading food and beverage labels. (POM Wonderful, supra, 134 S.Ct. at p. 2233.)
“The Court first explained that neither statute contained a provision that disclosed a purpose to bar unfair competition claims like that asserted by the plaintiff, (POM Wonderful, supra, 134 S.Ct. at p. 2237.) The Court found this absence of ‘special significance’ because the two statutes had coexisted for 70 years, and if Congress had 'concluded that Lanham Act suits could interfere with the FDCA, it might have' enacted a provision addressing the issue. (Ibid.) The Court noted that while Congress had enacted amendments to the FDCA and Lanham Act, including an amendment that addéd an express preemption provision with respect to state laws addressing food and beverage misbrand-ing, it did not enact a provision addressing the preclusion of other federal laws in this area; in the Court’s view, this constituted ‘ “powerful evidence that Congress did not- intend FDA oversight to be the exclusive means” of ensuring proper food and beverage labeling.’ (Ibid.) The Court further found that the complex preemption provision added to the FDCA in 1990, which was the closest the statutes had come to addressing the preclusion of the plaintiffs Lanham Act claim, suggested that Lanham Act suits are not precluded. (Id. at pp. 2237-2238.)
“In finding the statutes complemented each other, the Court explained that the statutes have their own scope and purpose; while both touch on food and beverage labeling, the Lanham Act protects commercial interests against unfair competition, while the FDA protects public health and safety. (POM Wonderful, supra, 134 S.Ct. at p. 2238 [‘When two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended 'one federal statute to preclude .the operation -of the other.’].) The Court further explained that even when the Lanham Act touches on the same subject matter as the FDCA, Lan-ham Act suits provide incentives for manufacturers' to behave well and allowing such suits ‘takes advantage of synergies among multiple methods of regulation.’ (Id. at pp. 2238-2239.) The Court noted this ‘was consistent with the congressional design to enact two different statutes, each with its own mechanisms to enhance the protection of competitors and consumers,’ (Id. at p. 2239.)
“In reaching these conclusions, the Court rejected Coca-Cola’s argument that preclusion applied because Congress intended national uniformity in food and beverage labeling:. ‘Although the application of a federal statute such as the Lanham Act by judges and juries in courts throughout .the country may give, rise to some variation in outcome, this is the means Congress chose to enforce a national policy to- ensure fair competition. It is quite different from the disuniformity that would arise from the multitude of state laws, state regulations, state administrative agency rulings, and state-court decisions that are partially forbidden by the FDCA’s preemption provision. Congress not infrequently permits a certain amount of variability by authorizing a federal cause of action even in areas of law where national uniformity is important.’ (POM Wonderful, supra, 134 S.Ct. at pp. 2239-2240.)
“The court also rejected the government’s argument that Lanham Act claims were precluded ‘to the extent the *591 FDCA or FDA regulations specifically require or authorize the challenged aspects of [the] label.’ (POM Wonderful, supra, 134 S.Ct. at p. 2240.) The court found the' government’s position flawed—instead of the FDCA and its regulations being a ceiling on the regulation of food and. beverage labeling, Congress intended the two statutes to complement each other with respect, to such labeling. (Ibid.) The court explained: ‘The Government asks the Court to preclude private parties from availing themselves of a well-established federal remedy because an agency enacted regulations that touch on similar subject matter but do not purport to displace that remedy or even implement the statute that is its source. Even if agency regulations with the forcé of law that purport to bar other- legal remedies may do so, ... it is a bridge too ¡far to accept an agency’s after-the-fact statement to justify that result, here. An agency may not reorder federal statutory rights without congressional authorization.’ (Id. at p. 2241, citations omitted.)”
Fair, 238 Cal.App.4th at 284-86, 189 Cal.Rptr.3d at 161-63. The application of the reasoning of POM Wonderful to the interplay between the- FRSA -and FELA is straightforward.
“Like the FDCA, the FRSA authorizes an agency to promulgate specific regulations in furtherance of the statute’s purpose and provides that those regulations preempt certain state laws in the interest' of national uniformity. Like the Lanham Act, the FELA provides a broad private right of action under federal law that purportedly undérmines such uniformity. And like the relationship between the Lanham’ Act and the FDCA, the FELA and the FRSA complement each other in significant respects, in that each statute is designed to accomplish the same goal of enhancing railroad 'safety through different means. Under these circumstances, POM Wonderful clearly dictates that the FRSA should not be interpreted to preclude federal claims-under the FELA, in accordance with the plain meaning of its text.”
Henderson, 87 F.Supp.3d at 620-21. See also Fair, 238 Cal.App.4th at 286, 189 Cal.Rptr.3d at 163.
For the foregoing reasons, these courts have concluded that,
,“[i]n enacting the FRSA, Congress did not clearly express an intent to preclude FELA claims. To, the contrary, the purpose of the FRSA—‘to promote safety .in every area of, railroad operations and reduce railroad-related accidents and incidents,’ 49 U.S.C. § 20101—is entirely consistent with FELA’s goal of promoting the safety of railroad employees by facilitating their ability to recover for injuries caused by a railroad’s negligence.”
Henderson, 87 F.Supp.3d at 616 (footnote omitted). See also Noice v. BNSF Ry., 348 P.3d 1043, 1048 (N.M.Ct.App.2015) (stating that, “[although both laws are intended to have an impact on railroad safety, FELA’s thrust in protecting workers can easily exist apart from FRSA-enaeted regulation of industry safety standards”).
As the Henderson court noted, this conclusion does not render FRA regulations that are on point irrelevant in a FELA action.
“The FRSA’s regulations are simply to be treated like any other regulation in that complying with them may provide non-dispositive-evidence of due care, see, e.g., Tufariello [v. Long Island R.R.], 458 F.3d [80] at 91 [(2d Cir.2006)] (“‘Compliance, with a-legislative enact *592 ment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions.” ’) (quoting Restatement 2d of Torts § 288C (1965)), while violating them requires a finding of negligence per se, see Morant v. Long Island R.R., 66 F.3d 518, 523 (2d Cir. 1995) (‘It is well-settled that the FELA requires a finding of negligence per se when there has been a violation of a safety statute specifically aimed at the railroad industry.’ (internal quotation marks omitted)).”
Henderson, 87 F.Supp.3d at 617 (emphasis added).
We find persuasive the reasoning in cases such as Henderson, Fair, and Noice concerning the role FRA regulations should play in establishing the duty a railroad owes its employees under FELA. In this case that reasoning means that the fact that FRA regulations did not require Norfolk Southern to throw the switches inside the Daikin plant when it inspected them constitutes non-dispositive evidence of due care on Norfolk Southern’s part. On the other hand, Lydick testified that in his opinion the fact that the track 4 switch repeatedly had been reported as hard to throw should have made Norfolk Southern inspectors take the additional precaution beyond visual inspection of throwing the switch. Lydick further testified that taking such a step would have revealed the defect in the switch that ultimately led to Cottles’s injury. Consequently, a conflict of evidence exists as to whether Norfolk Southern should have conducted inspections in a manner that would have revealed the defect that caused Cottles’s injury.
Given Lydick’s testimony pertaining to Norfolk Southern’s negligence and the standard of causation in a FELA action, we must conclude that Cottles presented substantial evidence creating a genuine issue of material fact as to whether Norfolk Southern negligently failed to provide him with a reasonably safe workplace. Accordingly, we reverse the summary judgment in favor of Norfolk Southern, and we remand the action to the trial court for further proceedings.[9]
REVERSED AND REMANDED.
BOLIN, PARKER, MAIN, and BRYAN, JJ., concur.
WISE, J., recuses herself.

. 45 U.S.C. § 51 provides, in pertinent part:
"Eveiy common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.”

. South worked on a different crew for Norfolk Southern at the Daikin plant.

. Switch points are segments of the tapering rails that are moved into position by the switch to direct a train onto the proper track.

. See 49 C.F.R. § 209.

. See 45 U.S.C. § 1 et seq.

. Cottles has conceded in his appellate brief that Daikin’s negligence, if any, cannot be imputed to Norfolk Southern under FELA.

. See 49 C.F.R. §§ 213.233 and 213.235.

. Norfolk Southern makes this argument despite the fact that it asserts in a footnote that
"industry tracks such as the Daikin tracks are not within the 'general railroad system of transportation' and that therefore the FRA Track Safety Standard regulations do not apply to them. See 49 C.F.R. 213.1 and 213.3(b)(1). However, in light of Lydick’s concession that [Norfolk Southern's] inspections complied with the federal regulations assuming they did apply, it ,is not necessary for the Court to resolve that question,...”

. Cottles also argues in this appeal that the trial court erred in refusing to consider the additional evidence he submitted along with his Rule 59(e) motion. Our disposition of this appeal pretermits any need to discuss or determine that issue.