[Cite as *Shiple v. CSX Transp., Inc.*, 2017-Ohio-411.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Jerome F. Shiple                                           Court of Appeals No. L-15-1275

     Appellee                                            Trial Court No. CI0201305291

v.

CSX Transportation, Inc.                          **<u>DECISION AND JUDGMENT</u>**

     Appellant                                           Decided:  February 3, 2017

\* \* \* \* \*

Robert E. Harrington, III and Robert B. Thompson, for appellee.

Andrew E. Tauber and Mark D. Meeks, for appellant.

\* \* \* \* \*

**YARBROUGH, J.**

## I.  Introduction

**{¶ 1}** Appellant, CSX Transportation, Inc. (CSXT), appeals the judgment of the Lucas County Court of Common Pleas, awarding appellee, Jerome Shiple, $240,000 in damages following a three-day jury trial on Shiple's Federal Employers' Liability Act (FELA) claim.

## A. Facts and Procedural Background

{¶ 2} On November 18, 2013, Shiple, a brakeman/conductor with CSXT, filed a complaint in the trial court, stemming from a workplace injury he sustained on November 25, 2010.  Specifically, Shiple asserted that he was injured while attempting to board a CSXT locomotive from the east side of the O01 departure track at the company's Stanley Yard in Walbridge, Ohio.  According to the complaint, this area was "commonly used by CSXT employees as a walkway and was designated by CSXT as a location for employees to board and dismount locomotive engines."  Shiple alleged that his injuries were caused by CSXT's failure to maintain a level walkway at Stanley Yard in accordance with its internal regulations governing the construction and maintenance of its walkway areas, as well as those of the Federal Railroad Administration and the American Railway Engineering and Maintenance of Way Association.

{¶ 3} On December 26, 2013, CSXT filed its answer, in which it denied any liability for Shiple's injuries and asserted several affirmative defenses including contributory negligence.  Following extensive pretrial discovery and motion practice, a jury trial began on September 21, 2015.  Shiple took the stand at the outset of his case-in-chief.

{¶ 4} During his testimony, Shiple testified that he was working as a conductor on the day of his injury.  As a conductor, Shiple was tasked with "switching of cars, building of trains, putting air in the trains, testing of trains, climbing up and down ladders, taking brakes on, taking brakes off, getting between the equipment, making air hose ties,

2.

everything you could think of to prepare the cars to move them out from one yard to another yard."

{¶ 5} On the day of the injury, Shiple was assigned to a train that was traveling on departure track O01, a line that runs north and south. According to his testimony, Shiple was trained to perform his work on the east side of the track, a practice he maintained throughout the course of his employment with CSXT.[1] Shiple maintained that the east side of the track was designated by CSXT as a walkway area. Shiple went on to explain that he routinely worked on trains from the east side of the track because the tools he needed (air hoses and the air plant) were located on the east side of the track. Also, Shiple was able to communicate more easily with the engineer in charge of operating the locomotive from his vantage point along the east side of the track, because the engineer's seat was on the east side of the locomotive.

{¶ 6} After preparing the train for departure from Stanley Yard, Shiple traveled back to the locomotive to board the train. In an effort to board the train, Shiple grabbed onto the handholds with both hands, and stepped onto the bottom step of the locomotive with his left foot. When Shiple pushed off the ground with his right foot, his right foot slipped, and he fell forward toward the locomotive. Shiple twisted his left knee during the fall. When asked about the cause of his fall, Shiple testified that the walkway ballast slipped under his feet. He further indicated that the walkway was not level along the east side of the track.

---

[1] Shiple worked for CSXT from 1970 until he retired in 2013.

3.

**{¶ 7}** Shiple was able to board the train despite the pain he felt in his left knee. However, Shiple soon informed the engineer that they "weren't going anywhere" after the pain in his left knee intensified. Shiple was then transported to St. Charles Hospital. While in the hospital, Shiple received a morphine injection for pain and an X-ray was taken of his knee. Shiple was released from the hospital after medical personnel put a splint on his knee and provided him with crutches and medication.

**{¶ 8}** Eventually, Shiple followed up with an orthopedic surgeon, Dr. Nabil Ebrahiem, who ordered an MRI of Shiple's left knee. At a subsequent appointment, Dr. Ebrahiem informed Shiple that surgery would be required to repair a large tear in his left medial meniscus. Shiple subsequently underwent surgery on his knee on January 11, 2011. Due to the condition of his left knee, Shiple was unable to return to work.

**{¶ 9}** At the conclusion of his testimony, Shiple elected to present the deposition testimony of one of CSXT's assistant terminal superintendents, Donald Sprandel, who was involved in CSXT's investigation of Shiple's workplace injury. Sprandel's recollection of the chain of events that led to Shiple's knee injury mirrored Shiple's testimony. In particular, Sprandel testified that Shiple informed him on the day of the incident that he had felt a "tweak" in his left knee after attempting to board the train. However, Shiple did not report any problems with the ground conditions along the walkway on the east side of the track to Sprandel.

**{¶ 10}** After speaking with Shiple, Sprandel traveled to the location of the incident. Once there, he examined the ground conditions along the east side of the O01

4.

track and took some photographs, which were admitted at trial. Sprandel indicated during his deposition that he considered the area along the east side of the O01 track to be a walkway, noting that the area was used as such ever since CSXT assumed control of the Stanley Yard in 1999. Sprandel later explained that the railroad used two types of ballast: main line ballast and walkway ballast. Walkway ballast is comprised of smaller stone that makes it more stable than main line ballast and, therefore, more suitable for walking. Sprandel noted that walkway ballast was placed along the east side of the O01 track.

{¶ 11} Regarding the conditions of the walkway, Sprandel testified that the ballast was not level at all locations along the O01 track. He went on to state that the ballast was approximately one inch below the railroad ties. When asked about the condition of the ballast at the location of Shiple's injury, Sprandel stated: "It was pretty level for, like I say, about two feet. Then I believe it went down 4 inches or so for another two feet or something, something like that." While examining the conditions of the walkway, Sprandel was able to determine that Shiple's right foot would have been close to the sloped ballast when he attempted to board the train.

{¶ 12} On the issue of whether it was commonplace for CSXT employees to utilize the east side of the O01 departure track at Stanley Yard, Sprandel testified that "the east side would be used more as far as trainmen would be concerned staying on the same side of the locomotive as the engineer where he could see it."

{¶ 13} As his next witness, Shiple called Raymond Duffany, an expert in the field of railway engineering. During the course of his testimony, Duffany noted that CSXT's

5.

internal ballasting specifications mandated a level walkway with walkway ballast that was level with the top of the railroad ties. Referring to photographs that were taken of track O01, Duffany indicated that the walkway conditions along the east side of the O01 track failed to meet CSXT's ballasting specifications insofar as the ballast was not level. Duffany explained that "whenever you step on ballast that's sloped, it's going to move, it's going to shift under your feet." To remedy this issue, Duffany stated that CSXT should have extended the ballast from the track so that workers would have a level surface to work on when boarding trains or walking along the track. Further, Duffany found that the mixture of large and small ballast along track O01 violated safety standards promulgated by the American Railway Engineering and Maintenance of Way Association (AREMA), which required the use of small ballast for walkways.

{¶ 14} At the conclusion of Duffany's testimony, Shiple presented the deposition testimony of Ronald Hartzell. As a CSXT roadmaster, Hartzell is tasked with supervising the maintenance of the Stanley Yard track structure. During his testimony, Hartzell acknowledged that the ballast used along the east side of the O01 track was a mixture of main line ballast and walkway ballast. He went on to state that the area in question was considered a walkway, and that the company generally uses walkway ballast in its yards. However, Hartzell noted that main line ballast was present along track O01 at the time of Shiple's injury "because this track hadn't been worked in a lot of years." Following Shiple's injury, CSXT performed maintenance along track O01, replacing several thousand railroad ties and surrounding the track with walkway ballast in

6.

an effort to bring the track to company standards. Hartzell also testified that the walkway surface on which Shiple's injury occurred was not level but, rather, was maintained at "a 2 to 1 slope" beginning 12 inches from the end of the railroad ties. Ultimately, Hartzell conceded that the walkway along the east side of track O01 did not comply with CSXT's specifications, which mandated a level walkway surface on this type of track, comprised of walkway ballast, for a span of 10 feet from the end of the railroad ties. In a subsequent affidavit presented to the jury during CSXT's case-in-chief, Hartzell recanted on his statement that the walkway was noncompliant, insisting that the ballast that supported track O01 complied with CSXT specifications.

{¶ 15} As his final witness, Shiple called Dr. Ebrahiem, who testified via deposition regarding the medical treatment Shiple received following the November 25, 2010 incident at Stanley Yard. According to Dr. Ebrahiem, Shiple presented with a large tear in the medial meniscus of his left knee. Dr. Ebrahiem testified that, to a reasonable degree of medical certainty, the knee injury was caused when Shiple slipped while trying to board the train at Stanley Yard. After diagnosing the tear, Ebrahiem informed Shiple that he would need to undergo surgery.

{¶ 16} Following the presentation of Dr. Ebrahiem's deposition testimony, CSXT moved for a directed verdict on Shiple's FELA claim. CSXT argued that the FELA claim was precluded by the Federal Railroad Safety Act (FRSA). Moreover, CSXT asserted that Shiple was negligent in failing to board the train from the west side of the

7.

track, where it was undisputed that the ballast was level.  Upon consideration, the trial court denied CSXT's motion, and the matter proceeded to CSXT's case-in-chief.

{¶ 17} As its first witness, CSXT called Andrew Bamford.  Bamford was the CSXT trainmaster in charge of Stanley Yard on the date of Shiple's injury.  After being notified of the injury, Bamford called for an ambulance an alerted Sprandel to the incident.  Subsequently, Bamford visited the scene of the injury with Sprandel in an effort to investigate the area and examine the locomotive.  During the investigation, Bamford boarded Shiple's locomotive in an effort to reenact the step height distance that Shiple had to negotiate in order to step onto the train.  Bamford testified that he boarded the locomotive from approximately the same location as Shiple, noting no exceptions to any of the ground conditions along the east side of track O01.  Bamford stated that he was able to board the locomotive without difficulty.  When asked whether railroad employees were permitted to work on the west side of track O01, Bamford answered in the affirmative.  However, Bamford acknowledged on cross-examination that most conductors work on the east side of the track.

{¶ 18} As its second and final witness, CSXT called its assistant division engineer, Troy Kopke, to the stand.  As assistant division engineer, Kopke is responsible for the maintenance of tracks in the region that includes Stanley Yard.  Kopke stated that the ballast along the east side of track O01 could not be leveled without violating federal regulations regarding track maintenance and presenting a "slip-trip-fall hazard" due to a lack of proper drainage.

8.

{¶ 19} Following the conclusion of Kopke's testimony and the admission of CSXT's exhibits, the parties moved for directed verdicts on several issues. Relevant to this appeal, Shiple moved for a directed verdict on the issue of CSXT's contributory negligence affirmative defense. In support of the motion, Shiple's counsel stated that "the evidence in the case is that Mr. Shiple did what he was told to do and simply boarded the locomotive and was injured in that regard. I don't believe [CSXT has] established any evidence that he did anything wrong in that process." CSXT opposed Shiple's motion, arguing that the evidence demonstrated that Shiple could have boarded the locomotive from the west side of track O01 or moved the locomotive to a different location along the track prior to boarding. Ultimately, the trial court found no evidence to suggest that Shiple was negligent. Rather, the court concluded that the evidence established that boarding the locomotive from the east side of track O01 was the safer option given the necessity to communicate with the engineer, who was seated on the east side of the track. Therefore, the court granted Shiple's motion for directed verdict.

{¶ 20} Thereafter, CSXT renewed its motion for a directed verdict premised upon the contention that Shiple's FELA claim was precluded by the FRSA. The court rejected CSXT's argument and denied its motion. Following closing arguments, the matter was submitted to the jury. Following its deliberations, the jury found in Shiple's favor and awarded damages in the amount of $240,000.

{¶ 21} Two days later, the trial court issued a judgment order memorializing the jury's verdict. CSXT's timely appeal followed.

## B. Assignments of Error

{¶ 22} In its appellate brief, CSXT fails to set forth specific assignments of error, opting instead to assert two "issues" for our review. Under App.R. 16(A)(3), CSXT, as the appellant in this case, was required to include a statement of the assignments of error in its brief, with reference to the place in the record where each error is reflected. Rather than strike CSXT's noncompliant brief under 6th Dist.Loc.App.R. 10(F), we find that it is in the interest of judicial economy to simply treat CSXT's statement of the issues as a statement of its assignments of error. As such, CSXT's assignments of error are as follows:

> 1. Whether Plaintiff's claim – which challenges the configuration of ballast that CSXT used to support its track – is precluded by the Federal Railroad Safety Act and federal regulations covering the use of ballast that affects the track-support structure.

> 2. Whether the trial court erred in granting a directed verdict on CSXT's claim for contributory negligence even though it was undisputed that Shiple could have chosen to board the train from the other side, where the ballast was level.

## II. Analysis

### A. Directed Verdict Standard of Review

{¶ 23} In each of its assignments of error, CSXT challenges the trial court's decisions on motions for a directed verdict. Our review of the grant or denial of such

motions is de novo. *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920, ¶ 14 (8th Dist.); *Grau v. Kleinschmidt*, 31 Ohio St.3d 84, 90, 509 N.E.2d 399 (1987). Civ.R. 50 sets forth the standard for granting a motion for a directed verdict and provides, in part:

> (A)(4) When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶ 24} When a trial court rules on a motion for directed verdict, it must not consider either the weight of the evidence or witness credibility. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679-80, 693 N.E.2d 271 (1998). Instead, a directed verdict motion tests the legal sufficiency of the evidence. *See Eldridge v. Firestone Tire & Rubber Co.*, 24 Ohio App.3d 94, 96, 493 N.E.2d 293 (10th Dist.1985). The Civ.R. 50(A)(4) "reasonable minds" test "calls upon the court only to determine whether there exists any evidence of substantial probative value in support of [the nonmoving party's claims]." *Texler* at 679-80; *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68-69, 430 N.E.2d 935 (1982).

11.

**B. Trial Court's Denial of CSXT's Motion for Directed Verdict**

{¶ 25} In its first assignment of error, CSXT argues that the trial court erred in denying its motion for directed verdict where Shiple's FELA claim was precluded by the FRSA.

{¶ 26} In order to resolve CSXT's first assignment of error, we must examine the interplay of FELA and FRSA. The FELA makes a railroad liable to its employees who are injured by "the negligence of any of [its] officers, agents, or employees * * *, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." 45 U.S.C. 51. The statute provides a "cause of action sounding in negligence[.] Absent express language to the contrary, the elements of a FELA claim are determined by reference to the common law." *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 165-66, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007).

{¶ 27} Also touching on railroad operations, the FRSA's purpose is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 347, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000). To that end, the FRSA authorizes the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety." *Id.* Under 49 U.S.C. 20106(a)(1), the FRSA's express preemption provision, "[l]aws, regulations, and orders related to railroad safety * * * shall be nationally uniform to the extent practicable." "A State may adopt or continue in force a law, regulation, or order related

12.

to railroad safety * * * until the Secretary of Transportation * * * prescribes a regulation or issues an order *covering the subject matter* of the State requirement." (Emphasis added.) 49 U.S.C. 20106(a)(2).

{¶ 28} A state negligence action is preempted if a FRSA regulation "substantially subsume[s]" the subject matter of the suit. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). "This provision explicitly preempts only state laws, regulations, and orders; it does not mention other federal safety standards." *Nickels v. Grand Trunk W. R.R.*, 560 F.3d 426, 429 (6th Cir.2009). Notably, Shiple's negligence claim, while filed in state court, is premised on CSXT's violation of the FELA, a federal statute.

{¶ 29} Here, CSXT contends that Shiple's claim challenges the configuration of ballast that affects the track support structure, a subject governed by the FRSA under 49 C.F.R. 213.103 (the ballast regulation), which provides:

> Unless it is otherwise structurally supported, all track shall be supported by material which will—
>
> (a)Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;
>
> (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;

13.

(c) Provide adequate drainage for the track; and

(d) Maintain proper track crosslevel, surface, and alinement.

{¶ 30} In support of its preclusion argument, CSXT relies heavily on the Sixth Circuit's decision in *Nickels*. In that case, the plaintiffs brought FELA claims alleging that they were injured after years of walking on oversized track ballast. The court held that the ballast regulation "substantially subsumes the issue of ballast size," even though the regulation did not prescribe a specific size of ballast for certain types of classes or tracks, instead leaving that determination to the railroad's discretion. *Id.* at 431.

{¶ 31} In dissent, Circuit Judge Rogers noted that, "under the Supreme Court's FRSA federal preemption analysis, the FRSA regulations that require adequate physical support for rails do not sufficiently imply that railroads may use any grade of sufficiently supportive ballast, no matter the risk to employees who must walk on the ballast." *Id.* at 433. "Nothing in 49 C.F.R. 213.103 or any related regulations addresses the issue of trackside walkways and ballast size. The regulations generally require adequate support for the trains, and advert in no way to the nature of a walking surface." *Id.* The dissent acknowledged that a FELA claim could not be maintained where such claim would require the railroad to violate the ballast regulation, but found that the railroad had not demonstrated such incompatibility. Thus, the dissent concluded that the ballast regulation

> is a floor that guarantees a minimum level of safety and there are many ways that the railroad can meet the standard. The manner in which

14.

the railroad complies with the standard may involve using ballast that is more or less conducive to creating safe walkways for railroad employees. While compliance with the FRSA regulation is evidence of due care, it "does not preclude finding negligence if reasonable railroads would have taken additional precautions to prevent injury to their employees." *Id.* at 435-36, quoting *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 442 (5th Cir.2001).

{¶ 32} Notably, the FELA claim at issue in this case is not premised solely upon the size of the ballast used along the east side of track O01. Rather, Shiple alleges that CSXT was negligent in failing to provide a level walkway along the east side of the track. Thus, we conclude that the holding in *Nickels* does not control here. Federal and state courts have issued decisions similarly distinguishing *Nickels*. For example, in *Potrukus v. CSX Transp., Inc.*, N.D.Ohio No. 3:09CV744, 2010 U.S. Dist. LEXIS 73722 (July 21, 2010), the United States District Court for the Northern District of Ohio examined Potrukus's FELA claim, which alleged that CSXT's improper ballast maintenance and use of oversized ballast caused trauma to his right knee, culminating in a torn meniscus. CSXT filed a motion for summary judgment, in which it relied upon the Sixth Circuit's holding in *Nickels* in arguing that the FRSA preempted Potrukus's negligence claims under the FELA. The trial court found that the ballast size claim was preempted by the FRSA under *Nickels*. However, the court concluded that CSXT's reliance on *Nickels* was

15.

misplaced with regard to the ballast maintenance claim. *Id.* at *8. In so concluding, the court stated:

> Regulating the type of material used to support the track is different than regulating the maintenance of the material itself. Just because a type of ballast can "maintain proper track crosslevel, surface, and alinement[,]" however, does not mean that the railroad has, for example, filled in holes or graded the ballast, omissions which would exacerbate the ballast's natural, uneven conformation. *Id.* at *8-9.

{¶ 33} Likewise, the Court of Appeals of Indiana, in *DeHahn v. CSX Transp., Inc.*, 925 N.E.2d 442 (Ind.App.2010), found that the FRSA did not preclude DeHahn's FELA claim premised upon a workplace injury he sustained while inspecting railroad track. According to DeHahn, he was injured when some of the ballast that was covering the railroad ties on which he was walking "rolled out from under his feet," causing him to fall 40 feet down the railroad embankment. *Id.* at 445. After the trial court granted CSXT's motion for summary judgment, DeHahn appealed.

{¶ 34} On appeal, CSXT argued, inter alia, that DeHahn's FELA claim was precluded by the ballast regulations promulgated under the FRSA. *Id.* at 446. The court of appeals rejected CSXT's argument. At the outset, the court determined that the FRSA and the FELA are generally not in conflict. *Id.* at 450. Further, the court found that the ballast regulations "'are directed toward creating a safe roadbed for trains, not a safe walkway for railroad employees who must inspect the trains.'" *Id.*, quoting *Grimes v.*

16.

*Norfolk Southern Ry.*, 116 F.Supp.2d 995, 1002-03 (N.D.Ind.2000). The court went on to state:

> In the present case, DeHahn claims that the placement of the ballast on top of the ties, and CSX's failure to remedy this, caused him to slip and fall while inspecting the rail. [The ballast regulation] does not mention worker safety or whether ballast should be allowed to remain on crossties; it is instead concerned with ensuring that the railroad's track is structurally sound. In light of FELA's humanitarian purpose, and the liberal construction given to effectuate this humanitarian purpose, we cannot say that DeHahn's FELA claim that CSX was negligent by leaving ballast on top of crossties is precluded by FRSA regulations governing ballast. *Id.*

{¶ 35} Here, the parties agree that the ballast regulation is the only regulation governing railway ballast within the FRSA. Even a cursory glance at the ballast regulation reveals that it is directed at promoting a safe track structure for trains; it does not speak to a railroad's duty to provide safe *walkways* for employees alongside its tracks. *See Elston v. Union Pac. RR. Co.*, 74 P.3d 478, 488 (Co.App.2003) (finding that the FRSA does not preclude a plaintiff from bringing a negligence claim under the FELA for failure to provide safe walkways). Because it is silent on this issue, we find that the FRSA does not "cover" Shiple's FELA claim.

{¶ 36} This finding is further supported by the preclusion analysis set forth in *POM Wonderful LLC v. Coca-Cola Co.*, 134 S.Ct. 2228, 189 L.Ed.2d 141 (2014). In that

17.

case, POM Wonderful LLC asserted claims of false advertising against the Coca-Cola Company under 15 U.S.C. 1125(a) (the Lanham Act), alleging that Coca-Cola deceptively used the term "pomegranate blueberry" on the label of one of its products. *Id.* at 2235. The trial court granted partial summary judgment in favor of Coca-Cola, finding that the Lanham Act claim was precluded by regulations promulgated by the Food and Drug Administration (FDA) pursuant to the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. 301 et seq. *Id.* at 2235-36. The FDCA prohibits the misbranding of food and drink, and contains a provision preempting certain state laws on misbranding. *Id.* at 2235. On appeal, the Ninth Circuit Court of Appeals affirmed the district court's decision that POM Wonderful LLC's Lanham Act claims were precluded by the FDCA. *Id.* at 2236.

{¶ 37} In a unanimous decision, the Supreme Court reversed. At the outset, the court noted that "neither the Lanham Act nor the FDCA, in express terms, forbids or limits Lanham Act claims challenging labels that are regulated by the FDCA." *Id.* at 2237. The court found that the "closest the statutes come to addressing the preclusion of the Lanham Act claim * * * is the pre-emption provision * * *." *Id.* at 2238. The court was careful to draw a distinction between preemption cases (in which the question is whether a state law is preempted by a federal statute or agency action) and preclusion cases (in which a cause of action under one federal statute is precluded by the provisions of another federal statute). *Id.* at 2236. With that distinction in mind, the court addressed the preemption provision found in the FDCA, stating:

18.

[T]he provision does not refer to requirements imposed by other sources of law, such as federal statutes. For purposes of deciding whether the FDCA displaces a regulatory or liability scheme in another statute, it makes a substantial difference whether that other statute is state or federal. By taking care to mandate express pre-emption of some state laws, Congress if anything indicated it did not intend the FDCA to preclude requirements arising from other sources. Pre-emption of some state requirements does not suggest an intent to preclude federal claims. *Id.* at 2238 (citation omitted).

{¶ 38} The court went on to find that "[t]he structures of the FDCA and the Lanham Act reinforce the conclusion drawn from the text." *Id.* The court explained that "[t]he Lanham Act and the FDCA complement each other in major respects, for each has its own scope and purpose," and that, "[w]hen two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other." *Id.*

{¶ 39} Notwithstanding the foregoing principles, Coca-Cola argued that "the FDCA precludes POM's Lanham Act claim because Congress intended national uniformity in food and beverage labeling," and that "allowing Lanham Act claims to proceed would undermine the pre-emption provision's goal of ensuring that food and beverage manufacturers can market nationally without the burden of complying with a patchwork of requirements." *Id.* at 2239. The Supreme Court rejected this argument,

19.

because it found that "the pre-emption provision by its plain terms applies only to certain state-law requirements, not to federal law." The court characterized Coca-Cola's position as an attempt to have the court "ignore the words 'State or political subdivision of a State' in the statute." *Id.* at 2239. Relevant to CSXT's argument in favor of preclusion in the case sub judice, the court stated:

> Although the application of a federal statute such as the Lanham Act by judges and juries in courts throughout the country may give rise to some variation in outcome, this is the means Congress chose to enforce a national policy to ensure fair competition. It is quite different from the disuniformity that would arise from the multitude of state laws, state regulations, state administrative agency rulings, and state-court decisions that are partially forbidden by the FDCA's pre-emption provision. Congress not infrequently permits a certain amount of variability by authorizing a federal cause of action even in areas of law where national uniformity is important. The Lanham Act itself is an example of this design: Despite Coca-Cola's protestations, the Act is uniform in extending its protection against unfair competition to the whole class it describes. It is variable only to the extent that those rights are enforced on a case-by-case basis. The variability about which Coca-Cola complains is no different than the variability that any industry covered by the Lanham Act faces. And, as noted, Lanham Act actions are a means to implement a uniform

policy to prohibit unfair competition in all covered markets. *Id.* at 2239-40 (citations omitted).

{¶ 40} Here, Shiple argues that the Supreme Court's decision in *POM Wonderful* dispels CSXT's preclusion argument concerning his FELA claim. CSXT, for its part, contends that *POM Wonderful* is inapplicable here because the federal statutes at issue in that case were different than those at issue in this case. Upon consideration of the parties' arguments, we agree with Shiple that the preclusion analysis in *POM Wonderful* disposes of CSXT's preclusion argument. In so finding, we join a host of other courts that have rejected similar preclusion arguments raised by railroads seeking to avoid liability under FELA in the wake of the Supreme Court's decision in *POM Wonderful*. *See Henderson v. Amtrak*, 87 F.Supp.3d 610 (S.D.N.Y.2015) (finding that the broad scope of the FELA should not be limited by inference, and rejecting appellate decisions, including *Nickels*, that have reached the opposite result); *see also Hananburgh v. Metro-North Commuter R.R.*, S.D.N.Y. No. 13-CV-2799, 2015 U.S. Dist. LEXIS 34008 (Mar. 18, 2015) (holding that the FRSA did not preclude railroad employee's FELA claim premised upon railroad's alleged negligent track inspection and maintenance practices because the FRSA contains no "clearly expressed congressional intention" to preclude FELA claims); *Bratton v. Kansas City Southern R.R.*, W.D. Louisiana No. 13-3016, 2015 U.S. Dist. LEXIS 22116 (Feb. 24, 2015) (relying on *POM Wonderful* in denying railroad's motion in limine, in which it sought to exclude plaintiff's claims for negligent training and certification under the FELA on the basis that such claims were

21.

precluded by the FRSA); *Madden v. Antonov*, 156 F.Supp.3d 1011 (D.Neb.2015) (concluding that plaintiff's FELA claim, based upon railroad's alleged failure to provide a safe work environment, was not precluded by the FRSA, and finding that allowing FRSA to preclude FELA claims would work unmitigated harm on FELA's goal of promoting the safety of railroad workers by leaving injured workers with no recourse against their employer and insulating broad categories of potentially negligent conduct from any accountability); *Cottles v. Norfolk Southern Railway Co.*, S.Ct. of Alabama No. 1140632, 2016 Ala. LEXIS 96 (Aug. 26, 2016) (relying upon *POM Wonderful* in its reversal of trial court's grant of summary judgment to railroad on plaintiff's FELA claims based upon back and rotator cuff injuries he sustained while attempting to "throw" a switch that was allegedly defective); *Fair v. BNSF Railway Co.*, 238 Cal.App.4th 269 (2015) (finding that the FRSA had to be interpreted to harmonize its safety requirements with the private right of action provided under the FELA given a lack of express intent to preclude federal claims under the FELA); *Noice v. BNSF Railway Co.*, 383 P.3d 761 (N.M.2016) (affirming the appellate court's conclusion that the FRSA did not preclude plaintiff's FELA excessive-speed claim upon the recognition that the FRSA contained no provision expressly precluding the claim, and permitting the claim to proceed would further the purposes of both statutes).

{¶ 41} In *Henderson*, the court provided a persuasive list of similarities between the statutes at issue in *POM Wonderful* and those at issue here. The court stated:

Like the FDCA, the FRSA authorizes an agency to promulgate specific regulations in furtherance of the statute's purpose and provides that those regulations preempt certain state laws in the interest of national uniformity. Like the Lanham Act, the FELA provides a broad private right of action under federal law that purportedly undermines such uniformity. And like the relationship between the Lanham Act and the FDCA, the FELA and the FRSA complement each other in significant respects, in that each statute is designed to accomplish the same goal of enhancing railroad safety through different means. Under these circumstances, *POM Wonderful* clearly dictates that the FRSA should not be interpreted to preclude federal claims under the FELA, in accordance with the plain meaning of its text. Admittedly, whereas the objective of achieving nationally uniform laws in a particular area is explicitly stated in the FRSA's state law preemption provisions, that objective is merely implicit in the similar provisions of the FDCA. But it is clear from the reasoning in *POM Wonderful* that this relatively minor distinction does not warrant reaching a different result. Nothing in the Supreme Court's decision suggests that its reasoning hinged on Congress's failure to make explicit the FDCA's implicit objective of achieving nationally uniform laws related to food and drink labeling. *Henderson, supra*, at 621.

{¶ 42} In harmony with the aforementioned decisions applying the preclusion analysis from *POM Wonderful* to cases involving the FELA and the FRSA, we find that the FRSA and its regulations do not preclude Shiple's FELA claims. Therefore, we find that the trial court did not err in rejecting CSXT's preclusion argument and denying its motion for directed verdict. Accordingly, CSXT's first assignment of error is not well-taken.

### C. Trial Court's Grant of Shiple's Motion for Directed Verdict

{¶ 43} In its second assignment of error, CSXT asserts that the trial court erred in granting Shiple's motion for directed verdict on the issue of contributory negligence. CSXT argues that Shiple was contributorily negligent in deciding to board the locomotive from the east side of track O01, where the ballast was visibly sloping, rather than the west side of the track, where the ballast was level. However, as noted by Shiple in his appellate brief, the uncontroverted testimony presented at trial demonstrates that boarding the locomotive from the east side was common practice on track O01. Indeed, the evidence establishes that boarding the locomotive from the east side of track O01 was actually the safer option given the necessity to communicate with the engineer, who was seated on the east side of the track. Having examined the record in its entirety and finding no evidence that Shiple acted negligently in boarding the locomotive, we find the trial court did not err in granting Shiple's motion for directed verdict.

{¶ 44} Accordingly, CSXT's second assignment of error is not well-taken.

### III. Conclusion

**{¶ 45}** For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed. Additionally, CSXT's "Notice of Additional Authority" which was untimely filed without leave on November 9, 2016, is hereby stricken. CSXT is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Stephen A. Yarbrough, J.

James D. Jensen, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE